UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JAMES OSBORNE,

      *Plaintiff,*

v.

RENTGROW, INC.,

      *Defendant.*

No. 23-cv-10572-NMG

## <u>ORDER ON MOTION TO EXCLUDE EXPERT OPINIONS</u>

LEVENSON, U.S.M.J.

      Judge Gorton has referred to me Defendant's Motion to exclude "certain opinions" that Plaintiff proposes to offer at trial through two individuals whom Plaintiff has identified as expert witnesses in this case, Douglas Hollon and Gabriel Biello. *See Rentgrow, Inc.'s Motion to Exclude Certain Opinions of Plaintiff's Experts, Douglas Hollon and Gabriel Biello,* Docket No. 101. I have considered the parties' respective memoranda and attached exhibits (*see* Docket Nos. 102 (Defendant's Memorandum in Support), 108 (Plaintiff's Opposition).

      The ultimate question in this case is whether Defendant complied with the provision of the Fair Credit Reporting Act ("FCRA") that requires credit reporting agencies ("CRAs"), in preparing a consumer report, to "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e. Hollon is proposed as an expert on the credit reporting industry. Biello is proposed as an expert on Oregon law and on Oregon courts' practices with respect to expunging records of criminal convictions.

For the reasons set forth below, I allow in part Defendant's motion to exclude opinions of the first identified expert, Douglas Hollon. Hollon is an individual with long experience as an employee of consumer reporting agencies, who currently operates a consulting business. Broadly speaking, there are some areas in which Hollon's testimony meets the standards of Federal Rule of Evidence 702 and may be helpful to a trier of fact: these pertain to the feasibility of various strategies that a company could employ to improve the accuracy of information that it collects and subsequently sells about consumers' criminal and litigation histories. By contrast, Hollon's proffered opinions on the ultimate issue of whether Defendant employed "reasonable" procedures to assure the accuracy of its information do not appear to rest on any claim of familiarity with a particular industry norm, but rather on his interpretation of the legal requirements of the FCRA. As such, those opinions are inadmissible under Rule 702.

As for Gabriel Biello, his proposed expert testimony is inadmissible. Mr. Biello's only claimed expertise is as a lawyer. His proposed expert testimony includes matters of law, which are not proper subjects for expert testimony, and matters of routine procedure in a court's offices, about which he claims no personal knowledge. Biello may, however, be competent to testify from personal knowledge about at least one relevant point that is mentioned in his report.

### A.    Standards for Expert Testimony

"As the Supreme Court of the United States explained in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, Federal Rule of Evidence 702 assigns a 'gatekeeping role for the judge' to 'ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *López-Ramírez v. Toledo-González*, 32 F.4th 87, 94 (1st Cir. 2022) (alteration in original) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)). The 2023 amendment to Rule 702 underscores the importance of this gatekeeping responsibility. *See* Fed. R. Evid. 702 advisory committee's note to 2023 amendment ("[T]he rule has been amended to

clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule.").

Under Rule 702, a qualified expert may testify if the proponent of the testimony shows the Court that it "is more likely than not" that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

As the "gatekeeper" of expert opinion, the Court is required "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

For an expert's opinion to be admissible, it must rest upon an identifiable area of expertise, with determinable principles and methodology. This is a matter for the Court to determine. As the First Circuit has noted:

> [A]lthough the district court's "focus, of course, must be solely on principles and methodology, not on the conclusions that they generate," [*Daubert*, 509 U.S. at 595], "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert," *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). Rather, a "court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.*

*United States v. Jackson*, 58 F.4th 541, 550–51 (1st Cir. 2023).

When, as in this case, a proposed expert offers "specialized knowledge" that is not scientific or technical in nature, the Court must carefully consider whether—and to what extent—proposed testimony satisfies the requirements of Rule 702. As discussed below, a qualified witness may testify about "industry standards," but that does not open the door to untethered editorializing.

On the other hand, if the challenge to admissibility is based upon the weakness of the factual underpinning upon which an expert bases an opinion, that is typically not a ground for excluding expert testimony, rather that is a matter of weight and credibility for the jury to resolve. *Id.*

### B.    *Douglas Hollon*

Plaintiff wishes to offer Hollon's opinion that, broadly, Defendant did not employ—as required by the FCRA— "reasonable procedures to assure maximum possible accuracy" of information that Defendant obtained and reported. Defendant seeks to preclude Hollon from offering opinions about whether Defendant employed "reasonable procedures" in line with "industry standards," and about whether Defendant took steps aimed at assuring "maximum possible accuracy." These objections raise different legal issues, so I will address them separately.

Mr. Hollon's field of expertise is not readily identified. It is plainly not "scientific or technical" information of the sort that permits the Court, as gatekeeper, to measure it against the standards of a recognized discipline.

Most relevant to this case, Hollon's resume reflects that he previously worked for a well-known credit reporting agency for approximately 14 years and has for the past 5 years operated a business called Credit Experts of North Texas, LLC, which appears to be a consulting company. In that role, Hollon's resume reflects that he does the following:

Chief Executive Officer
▪ Prepare Expert Witness Reports
▪ Analyze litigation case documents
▪ Legal Research
▪ Deposition and Trial Testimony
▪ Consultation
▪ Training

Docket No. 102-5 at 52.

As noted above, Rule 702 does not limit expert testimony to "technical and scientific" matters, but also refers to "other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. As the Supreme Court has noted, "there are many different kinds of experts, and many different kinds of expertise." *Kumho Tire*, 526 U.S. at 150. Hollon's proposed testimony does not rest primarily "upon scientific foundations," so "the relevant reliability concerns may focus upon personal knowledge or experience." *Id.* But the requirement of "intellectual rigor" remains. *Id.* at 152. It is in that light that I consider Mr. Hollon's proposed testimony.

On the one hand, it appears that Hollon is familiar, based on his work experience and training, with various aspects of the credit reporting industry that would not be known to a typical juror. It makes sense to allow testimony regarding relevant matters which Hollon, by dint of his specialized knowledge, may be in a position to explain. A typical juror would likely not be familiar with the processes employed by credit reporting agencies to acquire, confirm, and update data, nor would a typical juror know about the various tools and services that may be available to accomplish those functions.

On the other hand, Hollon's report is replete with proffered opinions that do not rest upon any identifiable industry standard, but instead seem to reflect his own personal views about the application of various legal principles to the facts of this case. Many of these appear

5

indistinguishable from argument of counsel and cannot be squared with the requirements of Rule 702.

### 1.    *Opinion Testimony about Reasonableness*

Defendant's motion to exclude focuses on Hollon's repeated assertions that Defendant failed to follow "reasonable procedures." These are sprinkled throughout Hollon's expert report, as attached to Defendant's motion.[1] For example, Hollon opines:

- "It is hardly reasonable for RentGrow rely on a database that has not been updated for one to four years." Docket No. 102-5 at 13.

- "RentGrow does not have reasonable procedures to review criminal records prior to publishing them to property management companies." *Id.* at 14.

- "Had RentGrow followed reasonable procedures to assure maximum possible accuracy, it would have verified the criminal records which were available for viewing directly on the court's website for free." *Id.* at 15.

- "It is hardly reasonable for RentGrow rely on a database that has not been updated for one to four years." *Id.* at 23.

- "With this case, in my opinion, RentGrow failed to have reasonable procedures in place to assure that the sealed criminal records about Mr. Osborne, were not included on the consumer report about Mr. Osborne, that RentGrow sold to Integrity Management Company (Lakota Community Homes)[.]" *Id.* at 27.

- "Documents and testimony from RentGrow demonstrate that its procedures for ensuring maximum possible accuracy of its initial reports to property management companies are not reasonable, and resulted in RentGrow's inaccurate reporting to Lakota Community Homes." *Id.* at 45.

- "In my opinion, RentGrow does not have reasonable procedures to assure maximum possible accuracy of the information concerning consumer's reporting history for the reasons explained in the Summary of Opinions in this report (pg. 5)." *Id.* at 48.

---

[1] The version of Hollon's report (May 7, 2024) attached to Defendant's motion differs—in some places significantly—from the earlier-dated version attached to Plaintiff's opposition. *Compare* Docket No. 102-5 at 9–45 (Hollon's report dated May 7, 2024, as attached to Defendant's memorandum in support of its motion), *with* Docket No. 108-5 at 1–42 (Hollon's report dated February 29, 2024, as attached to Plaintiff's opposition to the motion). The differences are not explained.

- "If they did have reasonable procedures, RentGrow would have confirmed Plaintiff's criminal background history by directly obtaining the criminal records from Marion County, Oregon, available online." *Id.*

### a.    Testimony about Industry Standards

It is not unusual to permit testimony about industry standards, customs, and practices from an individual qualified to testify about those things. *See Levin v. Dalva Brothers, Inc.*, 459 F.3d 68, 79 (1st Cir. 2006) ("Expert testimony on industry standards is common fare in civil litigation."); *Pelletier v. Main Street Textiles, LP*, 470 F.3d 48, 55 (1st Cir. 2006) (same). But the Court still has a gatekeeping role. As the First Circuit has noted, "[m]indful of the wide variety of matters on which expert testimony may be useful, Federal Rule of Evidence 702 demands that the inquiry into an expert's methodology must be tailored to fit the circumstances of each particular case." *United States v. Encarnacion*, 26 F.4th 490, 505 (1st Cir. 2022). "Especially outside of scientific fields, factors bearing on the reliability of an expert's methodology will vary." *Id.*; *see also* Fed. R. Evid. 702, advisory committee's note to 2000 amendment ("Some types of expert testimony will not rely on anything like a scientific method, and so will have to be evaluated by reference to other standard principles attendant to the particular area of expertise").

Plaintiff attempts to cast Hollon's opinions as expert testimony about the standards and norms of an industry with which he has professional familiarity. *See* Docket No. 108 at 6–12. Indeed, Plaintiff captions his argument, "Hollon's Opinions and Testimony Concerning Industry Standards or Industry Norms Should Not Be Excluded." *Id.* at 6–7. But Hollon's report and Plaintiff's brief fail to supply any meaningful connective tissue between any industry norms (which Hollon may be competent to describe) and the opinions he offers.

b.      Failure to Identify Industry Standards of Reasonableness

Defendant notes that Hollon was—in his deposition—unable to identify any specific standard in the credit reporting industry defining reasonable procedures to ensure accuracy of reports. Whether there exists any widely accepted canon of standards in that industry, Defendant does not say. But Defendant points to Hollon's deposition testimony in which—when pressed by Defendant's counsel—Hollon was unable to identify or articulate a recognizable definition of the "industry standard" for the credit reporting industry. *See* Docket No. 102-4 at 3–4.

Defendant further points out that, to the extent that Hollon was able to articulate a basis for his views about an industry standard, Hollon pointed to, among other things, "court opinions, the CFPB guidance, and the FTC guidance." *Id.* at 4. In other words, Hollon's opinions appear to rest, *not* upon experience-based familiarity with practices in the industry, but instead, upon his reading of the law.

The mere fact that proposed expert testimony touches upon or incorporates legal standards is not, by itself, disqualifying. In highly regulated industries there is often a well-developed body of professional expertise (and lore) associated with good compliance practices, separate and apart from the bare legal standards governing those industries.[2] Moreover, "[t]he line between testimony regarding what the law requires and testimony describing how an

---

[2] Banking, investment management, and pharmaceutical management come to mind as industries with large numbers of in-house and third-party compliance professionals who specialize in providing advice and guidance aimed at assisting businesses in meeting their legal obligations. Experienced compliance experts in such fields may well be in a position to discuss widely followed industry practices (*e.g.*, typical internal audit and control procedures) and may be in a position to identify standards adopted or endorsed by associations of such compliance professionals. There may well be comparable compliance specialists in the credit reporting industry who could point to similar norms. I note that Hollon's resume lists a "CDIA FCRA Certification." Docket No. 102-5 at 52. But Hollon does not claim to base his opinions on any standard endorsed by the Consumer Data Industry Association ("CDIA") or any other such body.

industry practice typically operates is not always clear." *Ji v. Bose Corp.*, 538 F. Supp. 2d 354, 358 (D. Mass. 2008). Accordingly, the Court must consider carefully whether proposed testimony rests upon expert knowledge about industry practices or simply reflects a view about the law. Testimony based on the latter is inadmissible. "Testimony from an expert that describes industry practices may incorporate the expert's 'understanding of the law,' but 'the expert cannot testify as to what the law requires.'" *United States ex rel. Bawduniak v. Biogen Idec, Inc.*, No. 12-CV-10601, 2022 WL 2662678, at *4 (D. Mass. July 8, 2022) (quoting *Bacchi v. Mass. Mut. Life Ins. Co.*, No. 12-CV-11280, 2016 WL 1170958, at *3 (D. Mass. Mar. 23, 2016)).

The problem for Plaintiff is that Hollon does not appear to articulate any basis for his opinions *other* than his own reading of the law. There is nothing to suggest that he is in a position to offer opinions that are based upon any identifiable industry standard. He does not claim to base his opinion on a particular body of accepted or standard practices in the credit reporting industry. On the contrary, Hollon's report appears to reflect a highly critical view of the existing norms and practices. Hollon indicates that routine practices in the credit reporting industry fall below the minimum legal standards set by the FRCA. He asserts, for instance:

> I have learned when it came to a CRAs policies and procedures, CRAs, like RentGrow, are reactive companies. Based upon my experience and knowledge, many CRAs and Data Furnishers were, and still are, reactive companies. This case is an illustration of how RentGrow, a specialty CRA is a reactive company.
>
> In my opinion, most CRAs, like RentGrow, would innovate technology and products to generate income, but would not use the time and money to ensure their respective database was accurate, or what was being reported was accurate.

Docket No. 102-5 at 45–46.

Assuming Hollon is competent to testify about norms in the credit reporting industry, he offers no opinion that Defendant's practices fell below any such industry norm. Instead, what he

proposes to offer is his view that practices that he believes are rife in the industry actually violate the FCRA.

Given that Hollon does not purport to compare Defendant's procedures to any particular norm or standard of the industry, it is evident that his opinions on the subject rest on his interpretation of the law. As such, those opinions cannot satisfy the standards of Rule 702. As the Advisory Committee's note points out:

> If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply "taking the expert's word for it."

Fed. R. Evid. 702, advisory committee's note to 2000 amendment.

There is nothing to prevent *counsel* from arguing that Defendant violated the FCRA by following practices that may be widespread in the credit reporting industry. But that is a separate matter from the admission of expert testimony about industry standards. By way of analogy, when juries weigh claims of negligence or breach of implied warranty (which entail "reasonableness" determinations), it is often relevant whether a defendant met, exceeded, or fell below industry standards. And so, experts familiar with industry standards may opine on that point. But when it comes to deciding whether conduct that may have complied with industry norms nonetheless violated legal duties, *that* is a matter for the judge and the jury. *Cf. Hoover v. Hyatt Hotels Corp.*, 99 F.4th 45, 62 (1st Cir. 2024) (noting that, under Massachusetts law, "compliance with industry standards is not conclusive of the standard of care," but may "'provide evidence of negligence'—or the lack thereof." (quoting *Berish v. Bornstein*, 437 Mass. 252, 273 (2002))); *Marchant v. Dayton Tire & Rubber Co.*, 836 F.2d 695, 699 (1st Cir. 1988) (noting a holding of the Supreme Judicial Court that evidence of trade practices "was probative of the reasonableness of the challenged design" but "is not dispositive, and 'counsel may argue

that industry standards can and should be more stringent.'" (quoting *Back v. Wickes Corp.*, 375
Mass. 633, 643 (1978))); *Donovan v. Philip Morris USA, Inc.*, 65 F. Supp. 3d 251, 275 (D. Mass.
2014) ("Philip Morris's conformity with industry standards may be considered by the jury as part
of the risk-utility balancing test.").

Defendant points out that another court recently had occasion to consider Mr. Hollon's
proposed testimony in another FCRA case and squarely concluded that various of Mr. Hollon's
opinions fail the gatekeeping tests of Rule 702. *See* Docket No. 102 at 13; *Nelson v. Experian
Info. Sols, Inc.*, No. 23-CV-1634, 2024 WL 3219180 (D.S.C. June 27, 2024). The ruling in
*Nelson* does not spell out in detail the particulars of Hollon's report in that case, so it is unclear
whether this case is on all fours with *Nelson*.[3] But the reasoning in *Nelson* is broadly persuasive,
and devastating to Plaintiff's position:

> After a careful review of the parties' briefing and Hollon's expert report, the Court
> excludes Hollon's testimony as to whether Defendant's credit accuracy procedures
> are reasonable. As to the conclusion that it is not reasonable for Defendant to rely
> on data furnishers, (Dkt. No. 43-1 at 4) (opining that if Defendant "had reasonable
> procedures to assure maximum possible accuracy, it would have verified a deceased
> notation reported by a data furnisher before storing the information on an
> [individual's] file"), Hollon does not articulate concrete factual materials or sources
> on which he bases his conclusion. *Nucor Corp. v. Bell*, No. C/A 206-CV-02972-
> DCN, 2008 WL 4442571, at *4 (D.S.C. Jan. 11, 2008) ("The Supreme Court has
> advised district courts to require more than the mere 'ipse dixit' of the expert
> witness."). As to Hollon's opinion that the above describe[d] maintenance
> procedure is "faulty," Hollon again cites no reports, research, or other reliable
> material in reaching this conclusion. Nor does he explain how his professional
> background, experience, or training allow him to arrive at either of the above
> conclusions. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (without a
> connection between the witness' knowledge and the particular conclusions drawn
> "there is simply too great an analytical gap between the data and the opinion
> proffered"); *Brown v. Auto-Owners Ins. Co.*, 121 F.3d 697 (4th Cir. 1997) ("In this

---

[3] In *Nelson*, Mr. Hollon was testifying about the business practices of his longtime former
employer, a major credit reporting agency. *See* 2024 WL 3219180, at *3 ("At best, Hollon
attempts to rely on his prior experience working for Defendant to reach his conclusions."). In
that case, Mr. Hollon had available to him extensive and particularized knowledge about the
company at issue. Here, he can point only to general industry knowledge.

case, Brown's expert offered nothing more than his subjective belief on the cause of the collapse.")

. . .

Thus, for the reasons explained above, the Court excludes Hollon's opinions regarding the reasonableness of Defendant's procedures to ensure maximum accuracy in credit reports.

*Nelson*, 2024 WL 3219180, at *2–3 (first alteration in original).

Plaintiff's response to Defendant's argument regarding Hollon's proposed testimony about industry standards is essentially, "same to you." Plaintiff points out that Defendant's expert was also unable to pinpoint a definitive source for defining a term central to this matter that appears in the FCRA: "reasonable procedures." *See*, Docket No. 108 at 7–8; *see also* 15 U.S.C. § 1681e ("Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."). As Plaintiff puts it, "Defendant's expert could not provide a 'quick' answer about the FCRA industry standard because it is complicated and requires review of the specific facts and circumstances of each case, and *typically a jury*, to decide whether a CRA's conduct was 'reasonable' under those circumstances." Docket No. 108 at 8 (emphasis added).

In an oblique sense, Plaintiff's point may be valid. It remains to be seen whether *any* expert can offer an opinion on "reasonableness" that passes muster under Rule 702. As the First Circuit has noted in a case that involved this Defendant, gauging "reasonableness" under this statute is quintessentially a jury task. *McIntyre v. RentGrow, Inc.*, 34 F.4th 87, 99 (1st Cir. 2022) ("[T]he evidence as to the reasonableness of RentGrow's procedures to assure maximum possible accuracy was conflicting and, thus, presented a question of fact for the jury.").

Plaintiff devotes much of his brief to discussion of the (largely undisputed) point that "the reasonableness of a CRA's procedures is ordinarily a question of fact." *See* Docket No. 108 at 7. But pointing out that "reasonableness" is a jury question fails to address the key issue in this motion, which is whether Hollon's opinions about "reasonableness" meet the minimum standards for admissibility under Rule 702.

Plaintiff's other arguments are also beside the point when it comes to the admissibility of Hollon's opinions about reasonableness. Plaintiff points out, accurately, that Defendant does not challenge the factual foundation upon which Hollon rests his opinions. *Id.* at 9. Plaintiff discusses the *McIntyre* decision itself and quotes the First Circuit's holding that "a jury could find that RentGrow failed to implement reasonable procedures," but he does not explain how that holding supports the admissibility of expert opinion about that very question of fact. *Id.* (quoting *McIntyre*, 34 F.4th at 97–98). Plaintiff also points to a decision by the U.S. District Court for the Western District of Texas, which ruled that the prior litigation in *McIntyre* effectively put Defendant on notice of potential weaknesses in its procedures, which could be considered by a finder of fact in assessing whether Defendant acted "willfully." *See* Docket No. 108-4 at 12 (citing *Grant v. RentGrow, Inc.*, No. 21-CV-01172, 2023 WL 5813140, at *22 (W.D. Tex. Sept. 6, 2023)). Even assuming that is a valid point, none of this supports the admissibility of Hollon's opinion testimony.

Rounding out Plaintiff's submission regarding Hollon is an emphatic argument that the presence of a "limitation of liability" clause in Defendant's contract with its data supplier should be taken as evidence of a lack of care on Defendant's part. *See id.* at 10–11. Hollon's report, too, makes much of the presence of this clause. *See* Docket No. 108-5 at 12–13. In making this argument, Plaintiff simply illustrates that Hollon's proposed testimony is all but

indistinguishable from argument of counsel. When it comes to the limitation of liability clause, Hollon's report contains no information of the sort that an expert in the industry might plausibly supply. Hollon says nothing about whether such clauses are usual (or unusual) in contracts used in the credit reporting industry. Nor does Hollon provide any information about whether such clauses correlate to greater, or lesser, accuracy of information provided under such contracts. Essentially, Hollon offers nothing more—from an evidentiary standpoint—than the argument set forth by Plaintiff's counsel. Whether such an argument is persuasive may be for the jury to decide, but there is no good reason to dress up such argument as expert testimony.

In short, Plaintiff's brief fails to bridge the critical gap in Hollon's proposed opinion testimony. Apart from a vague gesture in the direction of legal standards—which are for the Court to interpret for the jury—nothing in Hollon's expert report demonstrates that his views rest on any identifiable, let alone widely accepted, industry standard for "reasonableness." Without such a foundation, Hollon's views are essentially argument—which is the province of counsel. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

### 2.    *"Ensuring Maximum Possible Accuracy"*

Defendant argues that Hollon should be precluded from testifying about "ensuring maximum possible accuracy." *See* Docket No. 102 at 12. Defendant contends that Hollon's proposed testimony about additional steps that Defendant could have taken to improve the accuracy of its records amounts to an assertion "that 100% accuracy is required as though the FCRA is a strict liability statute." *Id.*

Defendant's argument on this point is unpersuasive. As noted above, Hollon's proposed testimony about what Defendant *should* have done (*i.e.*, "reasonableness") does not pass muster under Rule 702. But that does not mean that Hollon should be precluded from testifying about the tools and techniques that were available to Defendant—*i.e.*, what Defendant *could* have done.

Defendant cites a medical malpractice case in which an expert was precluded from testifying about alternate medications that "could" have been used, when the expert failed to tie those alternatives to the standard of care. *See id.*; *Porter v. McHugh*, 850 F. Supp. 2d 264, 269 (D.D.C. 2012). But that precedent has scant bearing on the matter at bar. Hollon will not be offering expert testimony about the "standard of care" (reasonableness). And in this case, unlike a typical medical malpractice case, there is a statute that frames the concept of reasonableness by reference to "assur[ing] maximum possible accuracy." 18 U.S.C. § 1681e(b).

Hollon appears to be in a position to tell the jury about procedures or services that might have been more accurate than what Defendant used. For example, Hollon notes that Defendant obtained criminal records data from a provider, Cleara, and that Cleara offered a more expensive, but more accurate service. *See* Docket No. 102-5 at 13. Similarly, Hollon describes the ways a credit reporting agency might "flag" aged convictions (which could be subject to expungement). *See id.* at 14. He describes the way a credit reporting agency might directly access state court records. *See id.* at 15 ("[C]riminal records . . . were available for viewing directly on the [Oregon] court's website for free."). And he describes state-specific organizations that act as clearinghouses for information about expunged convictions. *See id.* at 14–15.

It will be for a jury to determine whether the kinds of steps that Hollon identifies are "reasonable," but Hollon's expertise may well help a jury learn what is possible. These are

matters that may not be known to the factfinder and that may be relevant. Whether or not the procedures Hollon points to would be practicable, or cost effective, can be explored by cross-examination, but their existence is relevant and plausibly within Hollon's competence.

This case may ultimately turn on the jury's determination of "reasonableness," but "maximum possible accuracy" is very much part of the applicable legal standard. As noted above, the statute requires "reasonable procedures to assure *maximum possible accuracy* of the information." 15 U.S.C. § 1681e(b) (emphasis added). Testimony about what steps *could* have been taken, therefore, is relevant, even if such testimony is not determinative on the question of reasonableness.

### 3.    Other Opinions

I note that Hollon's report is replete with assertions about various matters of opinion, and assessments of evidence, that are untethered to any identifiable industry standard and unconnected to any specialized expertise that Hollon may possess. None of these plausibly pass muster under Rule 702.

In this category I include such contentions as:

- **Opinions about whether items of evidence are contradictory:**

"In my opinion, RentGrow provided contradictory testimony." Docket No. 108-5 at 25. (The ensuing discussion may be acceptable as argument of counsel, but it is not expert testimony).

- **Opinion regarding causation of stress and anxiety:**

Mr. Osborne explained that he was harmed by RentGrow because RentGrow released in a consumer report to Lakota Homes that he had multiple criminal arrests and convictions that were, in fact, sealed by the court and effectively expunged under Oregon law. As a result, Mr. Osborne deals with anxiety and is distressed over false, sealed information being reported about him which discredits his character.

In my opinion, Mr. Osborne would not have to deal with the distress and anxiety caused by RentGrow, if RentGrow had procedures in place to assure that information it shared about Mr. Osborne was verified before releasing the inaccurate consumer report to Lakota Homes.

*Id.* at 32.

- **Opinion about Defendant's legal duties:**

  RentGrow has an erroneous view of its own duties under the FCRA. It has stated that 1681e(b) doesn't apply to RentGrow because it is a reseller, and thus it has different obligations because it "doesn't have a database of records that it maintains." It believes that its role is only to assemble and merge the records that it receives from its originating CRAs, and to accurately transmit that information to its end user clients. RentGrow takes no position on the accuracy of the records it receives from its vendors and transmits.

  In my opinion, this is incorrect. In my experience and review of the relevant legal materials (judicial opinions, etc.), resellers are CRAs under the FCRA, with the same statutory duty under 15 U.S.C. § 1681e(b) . . . .

*Id.*

- **Opinion about financial incentives for credit reporting agencies:**

  RentGrow generates millions of dollars in revenue each year selling reports to its customers/clients. RentGrow generates revenue regardless if the reports it sells are accurate or not.

  From my over 18 years' experience working in the credit reporting industry, in my opinion, costs of doing business took priority over doing what was right.

*Id.* at 34.

- **Opinion about whether companies are "reactive":**

  I have learned when it came to a CRAs policies and procedures, CRAs, like RentGrow, are reactive companies. Based upon my experience and knowledge, many CRAs and Data Furnishers were, and still are, reactive companies. This case is an illustration of how RentGrow, a specialty CRA is a reactive company.

  In my opinion, most CRAs, like RentGrow, would innovate technology and products to generate income, but would not use the time and money to ensure their respective database was accurate, or what was being reported was accurate.

*Id.*

17

In my opinion, RentGrow is a reactive company, not proactive company, when it comes to ensuring maximum possible accuracy. With my experience and observation, most CRAs, like RentGrow, receive and compile data from other sources without any sort of verification process for accuracy. In my opinion, the data is received on face value that it is accurate. From my review of the evidence, RentGrow receives, compiles, and sells the data and relies on the post-hoc defense of "we received the data from other sources" attempting to absolve them of any responsibility for the data being reported.

*Id.* at 35.

- **Opinion about financial motivations for credit reporting agencies:**

  In my opinion, many CRAs would change or update their policies and procedures when confronted with litigation, or when contacted by the Consumer Financial Protection Bureau ("CFPB") personnel, or specifically with CRAs, subscriber/data furnisher complaints, but not for the good of the consumer. In my opinion, most CRAs are beholden to shareholders and stakeholders.

*Id.* at 34.

- **Views about emotional distress associated with bad credit reports:**

  Although not every consumer may have an actual inaccuracy like Plaintiff, there have been in my experience many instances where consumers did have inaccuracies on their report. I recall listening to tens of thousands of persons on the telephone pour out their hearts and display how distraught they were over the misreported items on their credit files. I recall reading tens of thousands of letters of consumers explaining the pain and anguish they were experiencing because of the misreported items on their credit reports.

*Id.* at 36.

None of these observations is linked to any identifiable specialized expertise that would

be helpful to a finder of fact.

### C.    *Gabriel Biello*

Plaintiff proposes to offer "expert" testimony from attorney Biello on the following:

- A description of Oregon's criminal conviction expungement statute;

- The length of time it typically takes for the Marion County (Oregon) court to seal criminal records after a conviction has been ordered expunged; and

- Biello's conversation in April 2024 with an Oregon court employee regarding her mailing (in June 2022) of Plaintiff's expungement orders and Plaintiff's submissions of his expungement orders to the Foundation for Continuing Justice's Clearinghouse (on Biello's recommendation).

*See* Docket No. 102-6 at 17–19.

Mr. Biello's only claimed expertise is as a lawyer and, to the extent that Plaintiff proposes to call him as an expert witness, his testimony is inadmissible.

First, there is no occasion to call an expert to testify about Oregon's criminal conviction expungement law. If interpretation of that law is at issue, it will be for the Court—not a lawyer testifying as an expert—to explain the relevant legal principles to the jury. As the First Circuit has noted, it is black-letter law that "[i]t is not for witnesses to instruct the jury as to applicable principles of law, but for the judge." *United States v. Newman*, 49 F.3d 1, 7 (1st Cir. 1995) (quoting *Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 512 (2d Cir. 1977)); *see also Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 100 (1st Cir. 1997) ("Each courtroom comes equipped with a 'legal expert,' called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards." (quoting *Burkhart v. Wash. Metro. Area Transit Auth.,* 112 F.3d 1207, 1213 (D.C. Cir. 1997))).[4]

Plaintiff also proposes to have Biello testify about his observations regarding how long it typically takes for the Marion Count court to seal records of conviction after an expungement. This is in Biello's report under the rubric, "Common Understanding of Marion County Practice Pursuant to ORS 137.225." Docket No. 102-6 at 18. But Biello's status as an attorney in Oregon cannot be said to make him an "expert" about procedures in the clerk's office of a particular court in Oregon. Plaintiff offers nothing to suggest that the practices of a particular court are

---

[4] To the extent that the *existence* of the Oregon statute may have independent factual significance, that fact may be proved by judicial notice.

matters that require expertise to understand or interpret. Indeed, there do not appear to be any opinions or interpretations at all in Biello's report, beyond his bare recital of his understanding of routine practices in court offices. Nor does Biello suggest that he has any first-hand familiarity with the processes of that particular court.

To the extent that evidence of "an organization's routine practice" may be relevant, the Federal Rules of Evidence provide a recognized avenue for admission of such evidence. *See* Fed. R. Evid. 406 ("Evidence of a person's habit or an organization's routine practice may be admitted to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice."). It is not by expert testimony. Testimony about an organization's routine practice must come from a competent witness, *i.e.* someone with "personal knowledge." *See* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). The distinction between expert testimony and a foundation sufficient to support testimony about routine is well illustrated by the decision in *Mobius v. Quest Diagnostics Clinical Laboratories, Inc.*, 687 F. Supp. 3d 357 (W.D.N.Y. 2023). In that case, the Court permitted a medical expert to testify about whether a particular practice in taking blood samples was consistent with the relevant standard of care. *See id.* at 376. But it was for a clinician with direct personal knowledge to testify as to whether there was actually such a routine. *See id.* at 377 ("This testimony should, however, come from Ms. Fistola in the first instance as the person with the personal knowledge of her habits.").

In this case, by contrast with the *Mobius* case, we have a proposed "expert" who would offer no expert interpretation, and we have no witness who claims personal knowledge about the operating procedures of the court system in question.

As for Biello's report that he called a court employee on April 5, 2024, and that the court employee confirmed "that on June 2, 2022, she had in fact emailed the signed set aside orders," this is rank hearsay, subject to no apparent exception. Docket No. 102-6 at 19. There is no colorable argument for bootstrapping it into evidence as part of some purported expert testimony.

In short, there is no basis for admitting Biello's proposed "expert" testimony.

I note, however, that there *is* material in Biello's report that sounds like percipient witness testimony, which may potentially be admissible. Specifically, Biello reports:

> Marion County Judicial Assistant in charge of expungements, Cindy O'Neil, emailed me a copy of the signed orders on May 31, 2022. Upon receipt of the orders, I verified that the cases had been removed from the E Court system, which is the database in which Oregon criminal cases are maintained. I forwarded copies of the orders to Osborne that day . . . .

Docket No. 102-6 at 19. It is not entirely clear what Biello means by the phrase "I verified that the cases had been removed from the E Court system." If it means he personally conducted a computerized search on that date, he may be in a position to testify from personal knowledge about the search that he conducted and the results that he saw.

CONCLUSION

For the forgoing reasons:

Defendant's motion is ALLOWED in part and DENIED in part with respect to Hollon's testimony. While Hollon's opinions about "reasonable" practices are inadmissible under Rule 702, he may be competent to testify about particular practices and procedures that were available to credit reporting agencies.

Defendant's motion to exclude Biello's expert testimony is ALLOWED, subject to the caveat that Biello may be competent to offer relevant percipient testimony.[5]

/s/ Paul G. Levenson
Paul G. Levenson
Dated: December 17, 2024           U.S. MAGISTRATE JUDGE

---

[5] The parties are advised that under Rule 72(a) of the Federal Rules of Civil Procedure and Rule 2(b) of the Rules for United States Magistrate Judges in the United States District Court for the District of Massachusetts, any party seeking review by a district judge of these determination(s) and order(s) must serve and file any objections within fourteen days of being served a copy of this order, unless a different time is prescribed by the magistrate judge or the district judge. *See* Fed. R. Civ. P. 72(a). Such objections must specifically designate the order, or part, to be modified or set aside and the basis for objection. The district judge will set aside any portion of the magistrate judge's order that is found to be clearly erroneous or contrary to law. The parties are further advised that failing to follow the objection procedures of Rule 2(b) may preclude further appellate review. *See Phinney v. Wentworth Douglas Hosp.*, 199 F.3d 1, 4 (1st Cir. 1999); *Sunview Condo. Ass'n v. Flexel Int'l, Ltd.*, 116 F.3d 962, 964–65 (1st Cir. 1997).